MILLER SAW-TRIMMER COMPANY, Appellant, vs. CHESHIRE and others, Respondents.

*May 8—September 25, 1920.*

*Patents: Contract to assign future patents: Validity: Modification of contract: Consideration: Subject matter: Patented device forming integral part of new invention: Paper-feeding mechanism on printing press: Specific performance of contract: Estoppel.*

1. Where plaintiff had a contract with defendant whereby the latter was to assign to plaintiff patents which might be issued to him for inventions relating to paper-feeding mechanism for printing presses, the refusal of plaintiff to assist defendant in developing a subsequent invention of a printing press did not estop it from claiming the right to the patent for the feeding mechanism on the new press because of the fact that the defendant exhibited a model of the new device to plaintiff, where such model showed no invention relating to the feeding and handling of paper and plaintiff had no knowledge that defendant would embody such mechanism in his new press.

2. The defendants, who had knowledge of the contract between the inventor and the plaintiff, proceeded at their peril, so far as the rights of the plaintiff were concerned, in developing an invention which related to paper-feeding and handling devices.

3. A contract whereby the inventor of such paper-feeding mechanism for a particular type of press assigned his patent to another and agreed to assign all future patents he acquired for any paper-feeding mechanism, is not void as contrary to public policy on the ground that the contract is not qualified by place or circumstance, where it is limited to the period of the original patent, extends to particular kinds of inventions only, and does not deprive the public of the benefit of inventive genius in any excepting a specified field.

4. A subsequent contract between the same parties, which was executed for the purpose of carrying out the original intention of the parties to the preceding contract, is based on the consideration for the original contract, so that specific performance thereof will not be refused because later developments disclose that one of the parties should have made a better bargain, where there was no fraud and there was sufficient consideration for the original contract but only nominal consideration for the modification.

5. The assignment of all patents existing or in the future issued for inventions relating to paper-feeding devices to be attached to an existing press of specified type, is *held* not to include a paper-feeding mechanism invented and designed as an integral part of a newly invented press of a different type. ESCHWEILER and VINJE, JJ., dissent.

6. Where defendants, in an action for specific performance of a contract to assign patents, counterclaimed asking confirmation of their rights under the patents, but the issues did not present the question of infringement by those patents of patents previously assigned to plaintiff, the court will deny specific performance and not confirm defendants' rights so as to preclude an action for infringement, but will dismiss the counterclaim without prejudice to an action on proper issues to protect defendants' rights.

APPEAL from a judgment of the circuit court for Milwaukee county: OSCAR M. FRITZ, Circuit Judge. *Modified and affirmed.*

This is a suit brought by the plaintiff, the *Miller Saw-Trimmer Company,* a Pennsylvania corporation, for the specific performance of a contract entered into between its predecessor, Miller Saw-Trimmer Company of Michigan, a Michigan corporation, hereafter referred to as the Michigan Company, and *Edward Cheshire,* one of the defendants, a resident of Wisconsin, by which contract the said *Cheshire* assigned to the Michigan Company certain inventions relating to the feeding and handling of paper, and agreed that he would transfer to the said Michigan Company and its successors and assigns all such further inventions as he might make relating to the feeding or handling of paper during a period of seventeen years following the date of the

contract, as will more fully hereafter appear. The plaintiff claims that the defendant *Cheshire* has perfected certain new inventions which come within the scope of said contract, and that such inventions have been assigned to the other defendants in violation of the contract between the Michigan Company and *Cheshire.*

As a defense it is claimed on behalf of the defendants: *First,* that the contract between the Michigan Company and *Cheshire* is illegal; *second,* that the plaintiff is estopped to claim the benefit of said contract by reason of certain interviews between the plaintiff and *Cheshire* in March, 1917; *third,* that the defendant *Cheshire's* new inventions do not come within the scope of the contract referred to. The defendants counterclaimed, asking to have established and confirmed in them their rights to these new inventions.

The trial court held, *first,* that the contract in suit is a valid and subsisting obligation; *second,* that the defendants' cross-complaint seeking to establish rights in the inventions referred to be dismissed; *third,* that the plaintiff is not estopped to assert its rights under the contract in suit; *fourth,* that the defendant *Cheshire's* patent applications contain inventions in paper feeding and handling which come within the terms of the provisions of the contract in suit; *fifth,* that the facts and circumstances of the case are such as would make a judgment of specific performance inequitable and unconscionable.

This brief statement is made so that the issues litigated may be presented in brief form. In order that the questions raised on this appeal may be fully understood, a more detailed statement of facts is necessary, and in making this we shall simply condense the facts as found by the trial court.

The trial court found the status, residence, and relationship of the parties, and in addition to the facts already stated it appears that the defendant *Simplex Machinery & Tool Company* is a Wisconsin corporation, with its principal

office and place of business at Milwaukee; that the defendant *Milwaukee Automatic Printing Press Company* is a Delaware corporation duly licensed to transact business in the state of Wisconsin, with an office in the city of Milwaukee, where it has an established place of business; that the defendant *Cheshire* was forty-eight years of age in the month of January, 1911; was a skilful mechanic, a competent designer of machinery, and endowed in a high degree with the inventive or creative faculty; that during the year 1908, *Cheshire,* at the suggestion of one of the officers of the *Miller Saw-Trimmer Company* of Wisconsin, undertook the invention and improvement of apparatus for the feeding and handling of paper in connection with printing presses of the flat-platen type, especially the Gordon type of press, and conceived and made certain discoveries and improvements appertaining to such apparatus, which inventions were covered by applications filed in the United States patent office for letters patent; that the said Gordon type of printing press is a hand-fed press, in which the impressions are received by the paper while upon a flat platen, in distinction from a rotary or cylinder press, in which the paper is upon a cylinder or curved surface platen while receiving the impression; that in the operation of the Gordon type of press prior to defendant's invention the paper to be printed was placed on said flat platen by hand and by said platen conveyed to and pressed against the type bed, and then carried away from the type bed by said platen and the printed sheet removed therefrom by hand; that on the 20th day of March, 1909, *Cheshire* and the Wisconsin Company entered into a contract by which *Cheshire* agreed, in consideration of a royalty of $12.50 on each "feeder," and other valuable considerations, to grant to the Wisconsin corporation, its successors and assigns, the sole and exclusive right, authority, and license to make, use, lease, and sell, or otherwise dispose of, within the United States "sheet feeders" made in accordance with the invention described in the application

for letters patent, and all other inventions and improvements relating thereto, or that may be used in connection therewith or for a similar purpose, which had been made or were thereafter made or acquired by said *Cheshire* during the life of the patent; that in the latter part of the year 1909 *Cheshire* was employed by the Wisconsin Company at a salary of $200 a month for the purpose of further developing and perfecting apparatus embodying the inventions described in his application for letters patent, and letters patent issued thereon, the particular description of which is not material here; that after about six months the employment ceased, *Cheshire* not having in the meantime perfected a successfully operative and marketable apparatus for said purpose; that on the 22d day of November, 1910, *Cheshire* entered into a contract with the Michigan Company by which, in consideration of $5,000 paid to him in cash and a promissory note for $1,000 payable in one year with interest, and the payment to him of a royalty of $12.50 for each machine made by the Michigan Company under the contract until the total royalties thus paid should amount to $7,000, sold and transferred to the Michigan Company all right, title, and interest in and to the aforesaid letters patent in the United States and applications for letters patent, and in said contract *Cheshire* further agreed:

"That said assignment shall include all future inventions which may be made or acquired by said *Edward Cheshire* covering the mechanical devices or apparatus designed to be used in the operation of printing presses of the type known as Gordon or platen press and consisting of sheet feeders with its various parts and attachments for feeding said type of printing press, together with any parts or attachments or any and all inventions or improvements relating thereto or that may be used in connection therewith or for a similar purpose."

By said contract *Cheshire* further agreed to re-design the machine which constitutes the subject matter of the patents

and applications for letters patent, which designs were to be completed before January 10, 1911, and to furnish a complete drawing thereof within two weeks from January 10, 1911; and as compensation for services during that period the company was to pay *Cheshire* at the rate of $150 per month. On January 14, 1911, the Michigan Company requested *Cheshire* to sign an amended form of the contract of November 22, 1910, and thereupon and in response to such request *Cheshire* then and there executed a contract dated January 14th, and by said contract of January 14th the November 22d contract was amended as follows:

"The assignor hereby promises and agrees to sell, assign, transfer, and set over unto the assignee the entire right, title, and interest in and to such inventions as relate to the feeding or handling of paper which he may hereafter make or acquire during the term of seventeen (17) years from the date of this instrument, and in and to any applications or letters patent on such inventions and any letters patent that may be granted on such applications, and any re-issues or extensions of the same; and in and to his joint interest in any and all inventions which he may make jointly with another party or parties; and in any applications for letters patent on such joint inventions, and any letters patent which may be granted thereon, or any re-issues or extensions of the same. And he hereby agrees that he will, at the request and charges of the assignee, make application for letters patent for any of such future inventions as he may have or acquire, that the assignee may deem desirable, and that he will execute assignments and do all such other and further acts as are necessary to perfect the title of the assignee therein, and the assignor hereby sells and assigns to the assignee all rights to foreign patents for the inventions transferred, or to be transferred in the future, under this agreement, and agrees to sign, execute, and deliver, upon request, any and all documents deemed necessary by the assignee, its attorneys or agents, to the procurement of such foreign letters patent and for the purpose of completing and perfecting the title of the assignee therein. Provided, however, that the expense of applying for, obtaining, and keeping in force such foreign letters patent shall be borne by the assignee."

It further appears that the only consideration moving to *Cheshire* from the Michigan Company for the execution of the contract of January 14, 1911, was the sum of $10 in cash; that the other considerations to be paid to *Cheshire* by the contract of January 14th were those described in the already existing contract of November 22, 1910; that the Michigan Company paid *Cheshire* the sum of $10; that excepting for the changes of the provisions of the contract of November 22, 1910, relating to the assignment of future inventions, and the payment of the $10, the contracts of November 22, 1910, and January 14, 1911, were substantially alike.   *Cheshire* then completed the re-designing of the machine, furnishing the drawings thereof within the time limited by the contract of November 22d.   The Michigan Company paid him the agreed compensation.   The machine thus re-designed did not prove a commercial success.   In the month of May, 1912, the Michigan Company again asked *Cheshire* to re-design and perfect said machine, and agreed to pay *Cheshire* for said services a salary of $250 a month, and to pay rent and the costs of material required in such employment until the 24th day of November, 1913. During his employment *Cheshire* re-designed and perfected the machine, installed machinery for the manufacturing thereof, and the company commenced to manufacture the re-designed machines.   The first one was sold in the month of August, 1913.   In November, 1913, *Cheshire* quit the employment of the Michigan Company, and has not since that time been in the employment of the Michigan Company or any of its successors.

It further appears that before the 24th day of November, 1913, *Cheshire* had performed all the terms, conditions, and provisions of the contracts of November 22, 1910, and January 14, 1911, and it further appears that the plaintiff and its predecessors in interest paid to said *Edward Cheshire* at various times after said 14th day of January, 1911, royalties on machines sold by them at the rate of $12.50 per machine,

until the full sum of $7,000 was paid, the last payment being made on the 15th day of September, 1916; that the Michigan Company and its successors had fully and faithfully performed said contract. During the employment of *Cheshire* he devised and invented certain improvements in apparatus for feeding and handling paper in connection with the Gordon type of printing press, for which applications for letters patent were filed, a particular description of which is not material here. These inventions and the applications were assigned by *Cheshire* to the plaintiff or its predecessors. It further appeared that the plaintiff is by assignment dated June 11, 1913, the owner of all of the rights of the Michigan Company in and to the inventions and letters patent made by *Cheshire* covered by the contract down to November 24, 1913.

It further appears that the business of the plaintiff is the manufacture and sale of a device known as the Miller saw-trimmer, and since August, 1913, the manufacture and sale of the apparatus embodying the inventions relating to the feeding and handling of paper hereinbefore referred to, such apparatus being ordinarily known as the "Miller platen press feeder"; that such Miller platen press feeder was generally constructed and sold by the plaintiff as a unitary, self-contained attachment for printing presses of the Gordon type; that the plaintiff does not manufacture printing presses, but purchases them and attaches the Miller platen press feeder thereto. The plaintiff has invested a large amount of money in the development and exploitation of the inventions made by *Cheshire,* the amount exceeding $250,000; that up to May 31, 1919, 5,569 of said Miller platen press feeders were sold by plaintiff, at an aggregate sales price of $3,911,450, and that from May 31 to December 1, 1919, 1,906 of said machines were sold, at an aggregate sales price of $1,413,000. All of said press feeders were attached to or sold for attachment to the Gordon type of press, with the exception of four.

After *Cheshire* left the employment of plaintiff and prior to February, 1917, he conceived and invented an automatic cylinder printing press and constructed a small wooden model exemplifying to a limited extent the general design and co-ordination of some of the parts of said press; that in February, 1917, *Cheshire* exhibited said model to one of the plaintiff's officers, and in April, 1917, exhibited the model to its patent attorney and suggested that the plaintiff become interested in the development and exploitation of said cylinder press; that as exhibited said wooden model did not disclose to the plaintiff any new invention relating to the feeding or handling of paper, and that *Cheshire* did not inform the plaintiff that he intended to apply to the said cylinder press any invention made by him relating to the feeding or handling of paper; that none of the new inventions and patentable improvements in paper-feeding and handling devices, as described in the applications for letters patent thereafter filed and in the machines thereafter built in conformity thereto, with the exception of a transfer table, were exemplified by said model when it was exhibited to plaintiff's officers; that until October 7, 1918, plaintiff had no notice or information that *Cheshire* or any of the defendants used or intended to use any device or improvement invented by said *Edward Cheshire* relating to the feeding or handling of paper, on or in connection with said cylinder press; that said plaintiff has never, in any manner, authorized or licensed said *Edward Cheshire,* or any of said defendants, to use any device or improvement invented by the said *Edward Cheshire* relating to the handling or feeding of paper, on or in connection with said cylinder press or otherwise.

The plaintiff advised *Cheshire* in April, 1917, that it did not then desire to become interested in said cylinder press, and advised *Cheshire* that if he should invent or apply to said cylinder press or to any press any new invention in paper-feeding and handling mechanism that such invention

would belong to plaintiff under the terms of the contract of January 14, 1911. In May, 1917, the plaintiff advised *Cheshire* that it could not undertake the manufacture of his new machine, expressed interest in it, and asked him to defer the matter until the next fall; that in May, 1917, *Cheshire* exhibited the model before referred to to Paul D. Durant, and submitted to Durant the communications which had passed between *Cheshire* and the plaintiff during the months of February to May, 1917; that in reliance thereupon *Cheshire* entered into a contract with Durant and his associates by which Durant and his associates were to furnish the funds to construct a cylinder press in accordance with the model. *Cheshire* entered their employ for the purpose of perfecting the invention, at a salary of $250 a month, and was to receive twenty-five per cent. of the capital stock of the corporation to be organized and certain royalties; and in consideration therefor he agreed to convey the invention and letters patent which should be obtained thereon to Durant and his associates and successors. Durant and his associates furnished capital to the amount of $8,000, and subsequently the *Simplex Machinery & Tool Company* was organized with a paid-in capital stock of $25,000.

"That said cylinder press, as finally developed by said defendants, is comprised of a printing bed and an impression cylinder which are relatively movable in opposite directions in vertical planes, a transfer table moving in unison with the cylinder and receiving the sheets of paper, means for automatically feeding said sheets to said transfer table and to said cylinder and registering and gripping them in said cylinder, and also means for delivering said sheets, after the printing operation, to a delivery table and properly stacking them thereon; that the said cylinder press is commercially inoperative and impractical without said feeding, registering, and delivery means, or any of them; that said means, and each of them, were constructed for use as essential parts of the said cylinder press; and that without adaptation and modification, said feeding, registering, and

delivery means are each incapable of practical use on any other type of printing press."

After the development of said invention another corporation, the defendant *Milwaukee Automatic Printing Press Company,* was organized with a capital stock of $250,000 for the purpose of engaging in the general business of manufacturing the cylinder press with the automatic paper-feeding and handling devices embodied therein. Up to the time of the trial said *Milwaukee Automatic Printing Press Company* had expended $25,000 in cash for tools, machinery, patterns, and equipment which are especially adapted to the manufacture of said automatic cylinder press.

In the month of January, 1918, the plaintiff first learned that *Cheshire* was working upon a cylinder press to which paper was automatically fed, but was unable to procure any information as to the details thereof until the 8th day of October, 1918, when a representative of the plaintiff first learned of the construction of said cylinder press and the paper-feeding and handling apparatus connected therewith.

The court found:

"That in said cylinder printing press, as developed and about to be exploited by said *Edward Cheshire,* in co-operation with his codefendants, there are embodied certain new inventions in paper-handling and feeding devices which are the inventions of said *Edward Cheshire;* that said new inventions in paper-handling and feeding devices are of such nature and character that they are within the terms of said contract made on January 14, 1911; that said new inventions are not designed to be used in the operation of said Gordon type of press, and hence are not within the terms of said contract dated November 22, 1910."

That *Cheshire* swore to his inventorship of the paper-feeding and handling devices as embodied in the cylinder press in said applications for letters patent; that the inventions and applications for letters patent had been assigned to the *Milwaukee Automatic Printing Press Company* by the *Simplex Machinery & Tool Company;* and that the *Mil-*

*waukee Automatic Printing Press Company* took the assignment with full knowledge of the contract of January 14, 1911.

The court further found:

"That of the 124 claims set forth in said application for letters patent designated as Serial No. 224,426, 107 claims, to wit, claims numbered 1 to 100, both inclusive, and claims numbered 118 to 124, both inclusive, relate principally to the feeding or handling of paper; and that twenty-one claims, to wit, claims numbered 34 to 54, both inclusive, of the claims set forth in said application for letters patent designated as Serial No. 329,926, relate principally to the feeding or handling of paper."

It further appears that the plaintiff had not requested *Cheshire* to make an assignment to it of any of the inventions or applications for letters patent embodied in the cylinder press.

For reasons stated in a carefully prepared opinion, the trial court concluded as a matter of law that the plaintiff was not entitled to have the contract of January 14, 1911, specifically performed; that the defendants were entitled to judgment vacating all injunctions *pendente lite* which had been issued, and dismissing the complaint on its merits, with costs; that the plaintiff is entitled to judgment dismissing the counterclaim of the defendants on its merits; and that the defendants are entitled to recover from the plaintiff such damages as they sustained by reason of the injunctions issued *pendente lite.* Judgment was entered accordingly, and from the judgment so entered the plaintiff appeals.

For the appellant there were briefs by *Austin, Fehr, Mueller & Gehrz,* attorneys, and *Melville Church* and *Frank T. Boesel,* of counsel, all of Milwaukee; and the cause was argued orally by *Mr. Church* and *Mr. Boesel.*

*Frank M. Hoyt* of Milwaukee, attorney, and *Robert H. Parkinson* of Washington, D. C., and *George L. Wilkinson* of Chicago, of counsel, for the respondents.

The following opinion was filed July 3, 1920:

ROSENBERRY, J.   The trial court held, and we think cor-
rectly, that no estoppel arose as against the plaintiff by
reason of the transactions had between the plaintiff and
*Cheshire* at the time *Cheshire* went to Pittsburg to exhibit
his new invention to the plaintiff.   While it was argued
strenuously by the defendants that the plaintiff is estopped,
certainly no estoppel arose upon the facts as found by the
trial court, and the findings in relation to estoppel are amply
sustained by the evidence.

The trial court found that the wooden model exhibited
by *Cheshire* to the plaintiff did not disclose any new inven-
tion relating to the feeding and handling of paper, and that
*Cheshire* did not inform the plaintiff that he intended to ap-
ply to the cylinder press any invention made by him relating
to the feeding and handling of paper; that none of the es-
sential matters constituting the new inventions and patent-
able improvements in paper-feeding and handling devices
were exemplified by the model exhibited to the plaintiff.
Upon these facts it requires no discussion to show that no
estoppel arose as against the plaintiff.   *Cheshire* and the
other defendants knew that if *Cheshire's* new invention was
one relating to paper-feeding and handling devices it would
be claimed by the plaintiff under its contract; and in pro-
ceeding to develop *Cheshire's* new invention the defendants
proceeded at their peril so far as the rights of the plaintiff
were concerned.   *Littlefield v. Perry,* 21 Wall. (88 U. S.)
205; *Printing & Numerical R. Co. v. Sampson,* 44 L. J.
Ch. 705; *Aspinwall M. Co. v. Gill,* 32 Fed. 697; *Consoli-
dated R. E. L. & E. Co. v. U. S. L. & H. Co.* 77 N. J. Eq.
285, 78 Atl. 684.

The defendants attack the contract as amended on the
ground that it is void as against public policy, mainly upon
the ground that it was not qualified by place or circum-
stance, and extending as it does by its terms until *Cheshire*

shall reach the age of sixty-five years, it will operate to deprive the public of the benefit of the exercise of his inventive genius in this field. We shall not discuss this question in detail. By its terms the contract is limited to that period during which the assigned patent would extend, and by its terms the contract is limited as to particular kinds of inventions and does not. deprive the public of the benefit of *Cheshire's* inventive genius in any excepting the specified field. We see nothing in the contract which in any way contravenes public policy. *Aspinwall M. Co. v. Gill,* 32 Fed. 697; *Westinghouse A. B. Co. v. Chicago B. & M. Co.* 85 Fed. 786; *Littlefield v. Perry,* 21 Wall. (88 U. S.) 205; *Atlas P. Co. v. Eames* (Mich.) 173 N. W. 344.

The trial court was of the opinion that, although the contract was valid and the plaintiff was not estopped, the plaintiff was nevertheless not entitled to have the contract specifically enforced, because under the facts and circumstances it would be unconscionable and inequitable to decree specific performance of the contract dated January 14, 1911. We cannot state more briefly than in the language of the trial court the facts upon which this conclusion was based:

"1st. In the first place, the plaintiff necessarily relies upon the enlargement, by the contract of January 14, 1911, of *Cheshire's* obligation to assign future inventions, as basis for its claim that it is entitled to an assignment of the new inventions, asserted by *Cheshire* in claims No. 1 to 100 and No. 118 to 124, in application No. 224,426, and in claims numbered 34 to 54, in application No. 329,976.

"As consideration for that enlargement of *Cheshire's* obligation, only $10 were paid to him. No other consideration was paid or promised him, and no additional obligation, forbearance, or detriment was incurred by the *Miller Saw-Trimmer Company* as consideration for that enlargement of *Cheshire's* obligation. Hence, at the outset the court is confronted with the fact that the enlarged rights which plaintiff now seeks to have specifically enforced in equity are founded upon a new consideration of only $10.

"2d. Next, it is important to note that neither under the contract of January 14, 1911, nor under the contract of November 22, 1910, was *Cheshire* entitled to continue in the employment of the plaintiff, or its predecessors in interest, for any definite period of time. Since November 24, 1913, he has not been in the employment of the plaintiff, or its predecessor, and has not received anything from the plaintiff, or its predecessor, excepting the balance of the sum of $7,000 which was payable as royalties on account of the patents originally assigned by him, and which was completely paid by September 15, 1916.

"3d. On the other hand, the new inventions, the ownership of which is now in dispute, were neither conceived nor developed until after *Cheshire* had ceased to be in the employment of the plaintiff and its predecessors in interest, and to receive any compensation whatsoever from those sources.

"4th. Neither the plaintiff, nor its predecessors in interest, ever promised to compensate *Cheshire* for any new invention which he might make after the termination of his employment by them. ·

"5th. Likewise, the contract fails to reserve to *Cheshire* any interest in the future inventions by way of ownership by him of an undivided interest therein, or of future compensation to him, as royalties or annuities, during the use of such inventions by the plaintiff, or of ownership, or the privilege of acquisition, by him, of stock in a corporation which was to own, or enjoy the fruits of, such future inventions.

"6th. *Cheshire's* inventions after November 24, 1913, relate primarily to the printing means of his new cylinder press. The invention of the new paper-feeding and handling devices was but incidental to his invention of those printing means. Those paper-feeding and handling devices were necessary to render the press automatic and commercially operative. They are inapplicable for practical use on any other type of press without modification and special adaptation. And the plaintiff does not claim to be entitled to such of the new inventions as relate solely to the printing and not to the feeding and handling of paper.

"7th. Those new inventions are not necessary for the completion into a practically operative machine, of the paper-feeding and handling devices manufactured by the plaintiff for use on the Gordon press.

"8th. Further, *Cheshire* first offered the plaintiff a reasonable opportunity to acquire an interest in the new inventions relating to the press itself, and only sought to interest his present codefendants after the plaintiff failed to accept that offer. Since then, *Cheshire* and his codefendants, in good faith, have undertaken and proceeded with the development and perfection of that press, including the paper-feeding and handling devices which were necessary for automatic operation, and for those purposes they expended about $33,000 up to the time of the commencement of this action."

In our judgment the trial court was in error in holding that the contract of January 14, 1911, was a separate and distinct contract and that the sole consideration therefor was the $10 as stated in the contract itself. We are of the opinion that the contract of January 14, 1911, must be considered in connection with the contract of November 22, 1910. It is apparent from the face of the contracts that the agreement of January 14, 1911, was executed for the purpose of carrying out and expressing the original intention of the parties at the time the November contract was entered into. *Reece F. M. Co. v. Fenwick,* 140 Fed. 287; *Mississippi G. Co. v. Franzen,* 143 Fed. 501. So construed the consideration is not inadequate, and if *Cheshire's* new invention is within the terms of the contract there is nothing inequitable or unconscionable in compelling him to carry out his agreement. Where, as here, an inventor enters into a contract to assign and convey future inventions, upon an adequate consideration, there being no fraud, duress, or overreaching by the opposite party, both parties having entered into the contract in good faith and for their mutual benefit, the mere fact that subsequent developments show that the inventor should have made a better bargain for himself, or that the profits of the business have been exceptionally and unexpectedly large, does not affect the situation of the parties. The validity of the contract and the right of the parties to its enforcement is to be considered as of the date of the contract. Neither *Cheshire* nor the plaintiff's predecessors in title were in any way certain that *Cheshire's*

invention would ever prove commercially successful.    If, therefore, *Cheshire's* new invention was within the contract of November 22, 1910, as amended by the memorandum of January 14, 1911, the plaintiff was entitled to have its contract specifically performed.    This brings us to the consideration of the question, Is *Cheshire's* new invention within the terms of the contract as amended?

The language is:

"The assignor hereby promises and agrees to sell, assign, transfer, and set over to the assignee the entire right, title, and interest in and to such inventions as relate to the feeding or handling of paper which he may hereafter make or acquire during the term of seventeen (17) years from the date of this instrument," etc.

It is difficult to put upon paper an adequate description of *Cheshire's* new invention.    *Cheshire's* original invention constituted what would ordinarily be known and described as an attachment to an already existing press.    It could be put upon a hand-fed press, swung away from it so that the press might be fed by hand, and would facilitate making the press ready for a job.    We take from the brief of counsel a detailed description of this machine, which with the accompanying photographs (Exhibits 19 and 20) will make *Cheshire's* first invention understandable:

"The plaintiff's machine will readily be understood from the . . . photographs, Exhibits 19 and 20, of which Exhibit 19 shows the machine ready to print, and Exhibit 20 shows it with a section of the feeding and handling mechanism swung away from the press portion to facilitate making the press ready for a job, or to permit hand feeding.    The press portion of the machine consists of a rocking type-supporting member 'A,' called the bed.    It is pivoted at 'B,' so as to swing on a long radius.    The paper-supporting member 'C,' taking the form of a flat platen, rocks also, the bed and the platen rocking towards each other (coming into close contact under pressure) to perform the printing operation, and subsequently rocking away from each other so that the sheets may be fed to, and taken away from, the

Exhibit #19

Eixhibit-# 20

platen. When the platen rocks away from the bed to re-
ceive a sheet, it comes to a nearly horizontal position of
rest, to give time for a sheet to be placed upon it. This
much of the machine, is, as stated above, purchased from the
Chandler & Price Company, and suitably modified for the
reception of the paper-feeding and handling mechanism now
to be described.

"The paper-feeding and handling mechanism includes a
stock table, 'D,' upon which the pile, 'E,' of sheets is placed,
a large number of sheets being placed, in one stack, on this
table ready for feeding. Above the stock table, 'D,' is a
sheet-separating element, which includes a number of pneu-
matic suction feet, 'F,' having holes in their lower sides to
which suction is applied to cause a sheet of paper to attach
itself thereto. With the stack of sheets on the table, the
suction feet, 'F,' usually three in number, descend upon the
pile and engage the top of the first sheet near its front edge,
suction being applied to the feet at that time. The applica-
tion of the suction to the feet causes the top sheet of the pile
to attach itself thereto, whereupon the suction feet rise a
short distance, carrying with them the top sheet attached.
In this way the top sheet is individually released, by the
sheet-separating element, from the balance of the pile, raised
a short distance, and held in a position ready to be carried
forward to the platen, 'C.'

"An intermediate element carries the separated sheet for-
ward to the platen. This intermediate element includes a
cross-bar, 'H,' carrying mechanically actuated feed grippers,
'G,' which come towards the sheet in its separated and sus-
pended condition, grasp the sheet, and thereafter move out
over the platen, 'C,' sliding out in a plane parallel with the
latter. There is a stop or abutment, 'K,' on the platen, in
the path of the advancing sheet, against which the edge of
the sheet strikes. When these feed grippers, 'G,' originally
seize the sheet, they hold it firmly. After they have ad-
vanced part of the way across the platen, however, their
grip on the sheet relaxes; and afterwards they only hold the
sheet impositively, or loosely, so that when the sheet strikes
the abutment, 'K,' it is enabled to be pushed out from the
grippers, the grippers thereafter moving on their way, leav-
ing the sheet engaged with the abutment, 'K,' on the platen,
'C.' In the position of the parts shown in Exhibit 19 the

grippers have received the sheet from the separating position and have brought it part way out onto the platen. They have loosened their grip on the sheet and are just about to cause the sheet to strike the abutment, 'K' (a registering fork), and thereby be removed from the grippers and left on the platen. After this has been accomplished, the feed grippers retire out of the way and the platen moves forward to its printing position.

"After the sheet has thus been deposited on the platen and the grippers have moved back out of the way, the platen, 'C,' rocks forward to meet the advancing bed, 'A,' and the printing operation is performed. After the printing operation (as the platen begins to rock backward to receive another sheet), delivery grippers, 'L,' engage the face of the platen, entering between it and the rear edge of the sheet, and seize the sheet by this rear edge. After thus seizing the sheet they swing back over a delivery table. When they arrive over the delivery table, the delivery grippers, 'L,' open and the sheet falls onto the delivery table, the printed sheets thus being stacked, in a pile, 'M,' on the delivery table. Automatically actuated joggers, 'N,' are provided on the delivery table, which joggers intermittently strike the sides of the stack of printed sheets, bringing it into a neat and orderly pile ready for shipment.

"It will be understood that as the sheets are withdrawn one by one, in feeding, from the top of the pile 'E,' the height of the pile diminishes. With this separating device, it is a requisite that the top of the pile shall remain at a substantially constant level. To provide for this, the stock table, 'D,' is equipped with an automatic mechanism which raises it intermittently on each cycle of the press; that is, the table rises a given increment on each operation of the press to compensate for the diminished height of the pile due to the previous sheet being taken away.

"It has been stated that the sheet, upon being fed forward by the feed grippers, 'G,' strikes an abutment, 'K,' on the platen, 'C.' This abutment takes the form of a spring fork, into the jaws of which the sheet is placed by the grippers; so that when the platen, 'C,' begins to move towards the bed for printing, the sheet is lying on the platen engaged in the jaws of this fork, 'K.' As the platen rocks forward to the printing position, the fork, 'K,' is given a movement

in the arc of a circle in the same plane as the surface of the platen, causing the sheet to be brought downwardly and sidewise. The downward movement brings the sheet against two stops, or end register pins, 'J,' on the platen, and the sidewise movement brings it against a side-stop or side-register pin on the platen (not seen in the photographs). The sheet is thus left in engagement with these two sets of stops, the end stops and the side stop, and is thus accurately placed on the platen so that the printing will be correctly placed on the paper. In other words, an accurate register is obtained in this way.

"In case a sheet should not be fed to the platen, were no mechanism provided to prevent it, the type on the bed would make an impression upon the surface of the platen, and the ink thus placed on the platen would be printed on the back of the succeeding sheets when they were fed again. To prevent this, a device is provided for causing the bed movement to be modified whenever a sheet is not fed, the modification of the bed movement having the result that the bed does not quite reach the platen, instead of pressing against it, as it does in the ordinary printing operation. The press portion is provided with a hand lever, 'O,' by which this device may be manually actuated. The paper-feeding and handling mechanism includes automatic means for operating this 'throw-out device,' as it is usually termed. The automatic mechanism is governed by the presence or absence of vacuum in the suction feet, 'F.' In other words, when a sheet is raised by the suction feet, 'F,' this sheet seals the air openings in the bottom of the feet; consequently there is a vacuum in the suction feet. When no sheet is lifted by the suction feet, air can be drawn in through the holes in the bottom; consequently there is no vacuum in the suction feet. The automatic mechanism for actuating the throw-out device is so arranged that when there is a vacuum at the feet, 'F,' the throw-out device will not be actuated; but when there is not a vacuum in the feet, the throw-out mechanism will be actuated. When, therefore, the machine misses feeding a sheet, the throw-out mechanism will automatically operate and prevent damage from resulting.

"A section of the paper-feeding and handling mechanism is made to swing vertically about a pivot, as seen in Exhibit 20; so that it may be easily put out of the way to permit an

operator to feed the press by hand if desired, and to permit of the platen being easily made ready for printing a job. By 'made ready' is meant the usual operations which must be performed on the platen preparatory to printing a job.

"The suction feet, 'F,' are of a very especial construction, at their bottom faces, to insure the lifting of one sheet and prevent the lifting of more than one sheet. To further facilitate proper separation, the feeder mechanism is provided with a blower which blows air between the sheets while they are still piled at 'E,' from the front edges. The effect of the blowing in of air is to cause the top sheets to be afloat with a volume of air between them so that they are more easily separated."

*Cheshire's* new invention is described as follows:

"The defendant's most recent construction of machine . . . . will be understood from the photographs, Exhibits 21, 22, and 23. Exhibit 21 shows the machine in the position in which the platen is about to make its upward movement for printing a sheet, and then a sheet is there just about to be, or just has been, grasped by the grippers on the platen. Exhibit 22 shows the platen when it has completed the printing of a sheet, and has arrived at its topmost position, the printed sheet being about to be taken from it by the delivery grippers. Exhibit 23 shows chiefly the feeding and handling mechanism, and displays the grippers of the platen and the top face of the transfer board, with the platen part way between its upper and lower position.

"The defendant's machine includes a press portion and a paper-feeding and handling mechanism. The press portion comprises a vertically moving type supporting member, or bed, 'A,' and a vertically moving rolling impression member, or cylindrical platen, 'B,' which latter is pressed against the bed during the movements of the two parts. The movement of the platen, 'B,' is in the opposite direction to the movement of the bed, 'A,' that is, as the bed, 'A,' moves downward, the platen, 'B,' moves upward, and, rolling over the type, effects the printing impression. The cylindrical platen, 'B,' is provided with a number of grippers, 'J' (Exhibit 23), for seizing the sheet to be printed and retaining it on the impression member during the printing operation.

"The paper-feeding and handling mechanism includes a

Exhibit-#21

Exhibit- #22

*Exhibit - #23*

stock table, 'C,' upon which the paper to be printed is piled in the form of a stack, from which the sheets are separated and removed one by one by a sheet-separating element. The sheet-separating element includes a pair of pneumatic suction feet, 'D,' which are caused to periodically descend upon the top sheet of the pile, and, having suction applied to them, cause the top sheet to adhere to their faces. When the suction feet, 'D,' subsequently rise, they carry with them the top sheet of the pile, thereby separating it from the balance of the paper. The suction feet, 'D,' are carried upon a cross-bar, 'E,' which connects the top of a pair of long pivoted arms, 'F,' so that upon these arms, 'F,' being swung about their pivots, the suction feet are brought forward towards the press portion, into the position shown in Exhibit 22. The suction feet, 'D,' move from the position shown in Exhibit 23 (where they are just about to have suction applied to them) down onto the top sheet of the pile of paper. By reason of the suction the top sheet attaches itself to the feet, and, when the feet rise again back into the position shown in Exhibit 23, the top sheet is attached to them and thereby separated from the balance of the pile and raised therefrom. After this has taken place, the arms, 'F,' swing forward, carrying the suction feet over to an intermediate element for transferring it to the platen, 'B.'

"The intermediate element for transferring the sheet from the sheet-separating element to the cylindrical platen, 'B,' takes the form of a 'transfer board,' 'G,' which is carried by the frame of the platen, 'B,' so as to move vertically therewith. The transfer board, 'G,' has a vacuum chamber beneath it and has suction holes, 'H,' in its upper face. When the suction feet, swinging forward from the pile, bring the sheet over the transfer board, 'G,' the suction is cut off from the feet, thereby enabling the sheet to drop onto the support, and suction is simultaneously applied through the holes, 'H,' thus causing the sheet immediately to adhere to the transfer board, 'G.' In other words, the suction feet, 'D,' swing forward over the intermediate element, or transfer board, 'G,' and drop the sheet, owing to the suction being released; and the sheet is then immediately seized by the transfer board, by reason of vacuum applied through the holes, 'H,' in the face of the latter. When the sheet is thus seized by the intermediate member or transfer board, 'G,'

the platen, 'B,' is in its uppermost position and the sheet is close to the platen grippers, 'J.' As the platen, 'B,' descends, the transfer board, 'G,' descends with it, the sheet being held in place, during the first part of the descent, by the vacuum at the holes, 'H.' As the transfer board moves downward, and after it has moved part of the way, suction is cut off from the holes, 'H,' so that the sheet is then only held by its weight upon the support. By this time the platen grippers, 'J,' have opened ready to have the sheet fed against them. During the latter part of its downward movement the transfer board is given a forward movement relatively to the platen. This forward movement has the effect of pushing the front edge of the sheet against the stems of the platen grippers, 'J,' by which grippers the sheet is then seized. These operations have occurred by the time the platen, 'B,' has reached its lowermost position and is just ready to rise for the printing operation. As the platen, 'B,' rises (the bed, 'A,' at the same time descending), it rolls upon the type of the bed, and, in rolling, draws the sheet off from the transfer board, 'G,' and wraps it upon itself. The sheet is thus rolled against the type by the impression member, and the printing impression is made.

"When the platen, 'B,' reaches its uppermost position and the printing impression has been completed, delivery grippers, 'L,' swing forward and engage the edge of the sheet, between the platen grippers, 'J,' and grasp the sheet, removing it from the platen grippers, which latter are opened just at this time. The delivery grippers, 'L,' then swing back to a position over the delivery table, where they drop the sheet upon the printed sheets previously delivered. Jogging devices are provided for stacking the sheets into a neat pile.

"With the defendant's separating device, it is a requisite that the top of the pile of sheets to be fed shall be maintained at a substantially constant level. To this end, the stock table, 'C,' is provided with automatic mechanisms and devices for raising it intermittently, as the paper is removed.

"It has been stated that the transfer board, 'G,' has a forward movement, relative to the platen, to move the sheet into the platen grippers, 'J.' It also has a sidewise movement (the two blending as one diagonal movement), to effect a side register. The forward movement pushes the

sheet against the stems of the platen grippers, 'J,' thus putting it into accurately correct position endwise. The sidewise movement pushes the sheet against a side-register stop, 'K' (Exhibits 21, 22), thus putting it into accurately correct position sidewise. The sheet is thus accurately registered, whereafter the platen grippers, 'J,' close on it.

"The press portion is provided with a throw-out device, by means of which the cylindrical platen, 'B,' is prevented from rotating, during the printing portion of the cycle, when it is desired to prevent a printing impression being effected between the type and the platen impression surface. The paper-feeding and handling mechanism provides automatic means for operating this throw-out device, so as to actuate it whenever a sheet is not properly fed. This automatic means is controlled by the presence or absence of vacuum at the holes, 'H,' of the transfer table, 'G.' In other words, when a sheet is on the transfer table, this sheet seals the holes, 'H,' and a vacuum is consequently maintained. When no sheet is present on the transfer table, the holes, 'H,' are free, and there is no vacuum thereat. In the latter case, the automatic mechanism will actuate the throwout device. When, therefore, the machine does not feed a sheet, the throw-out mechanism will automatically operate and prevent damage from resulting.

"The stock table and its associated parts are made to swing away from the press portion to permit access to the press portion for make-ready or hand feeding. To the same end, the transfer table, 'G,' is made readily removable from the platen frame, and the cross-bar, 'E,' carrying the suction feet, is made readily removable from the arms, 'F.'

"The suction feet, 'D,' are of a complex construction, at their bottom faces, to insure the lifting of one sheet and prevent the lifting of more than one sheet. To further facilitate separation, blowers are provided for blowing air between the top sheets of the pile at their front edges."

In addition to the evidence, exhibits, and model, and briefs and arguments of counsel, the court has had the benefit of a view of the plaintiff's machine as well as of the defendant's machine in operation. Is *Cheshire's* new invention (defendant's machine) an invention which relates to

the feeding or handling of paper, or is it an automatic cylinder printing press? It cannot be denied that indispensable parts of *Cheshire's* printing press are mechanisms for feeding sheets of paper from piles of stock and delivering the printed sheets from the cylinder to a receiving pile. It is undisputed that those parts of the *Cheshire* press which relate to the feeding and handling of paper are incapable of practical use in connection with any other form of printing press or upon any other machine. We, however, do not regard this as controlling, but it is a fact entitled to weight in arriving at a determination as to the nature and character of the invention. The *Cheshire* press, while it embodies features found in other cylinder presses, contains, as the description shows, many modifications and inventions, and it is admitted that these modifications and inventions are indispensably necessary to its operation. Those parts of the invention which have to do with the feeding and handling of paper are not operative for any purpose unless used in the machine of which they are a constituent part. Cylinder presses automatically fed were well known to the art long before *Cheshire* brought out his invention. If *Cheshire's* new invention be taken apart and each operation therein be considered by itself, it might well be said that some of the mechanism relates to the feeding and handling of paper, but in determining whether or not the invention as a whole relates to the feeding and handling of paper, as that term was used in the contract, or whether it is an automatically fed cylinder printing press, the invention must be considered as a unit. It cannot be considered as a series of correlated inventions some of which relate to one thing and some to another. *Cheshire* invented a cylinder printing press, automatically fed. The completed operation of the machine is properly described as printing. No unit of the machine feeds or handles paper. In the complete operation of the invention a sheet of paper is taken from one table, passed into the machine and printed, and then deposited upon an-

other table.   It does by itself what a hand-fed press does when operated by a pressman; that is, it performs the work of printing.   The machine, therefore, is not one for feeding and handling paper, but for printing.   Not being an invention for the feeding and handling of paper it is not covered by the amended contract.   We are governed in arriving at this determination not by the language used by *Cheshire* in his application for letters patent, or any other collateral fact or circumstance, but base our conclusion upon the fact that the invention as a whole relates not to the feeding and handling of paper, but to printing.

We are not here concerned with the question of whether or not the use of some of the elements of this machine constitutes an infringement upon the plaintiff's rights under the letters patent assigned to its predecessors by *Cheshire.*   That is a question that is not within the issues made by the pleadings, and is an entirely different question.   The terms of the contract do not embrace a printing machine merely because as a component part of it there are devices within it which, when operating with the machine as a whole, feed and handle paper.

Plaintiff's cause of action rests upon the amended contract.   Its right to the relief sought depends upon whether *Cheshire's* new invention is covered by the terms of that contract.   Not being within its terms, the plaintiff is not entitled to the relief prayed for in its complaint.   The judgment of the trial court as to the issues raised by the complaint should therefore be affirmed.   Logically it would seem to follow that the defendant is entitled to have its rights to *Cheshire's* new invention confirmed in it pursuant to the prayer of its counterclaim.   This would be true if all of plaintiff's rights were embraced in the terms of the amended contract; but it is the assignee of several letters patent assigned to it and its predecessors by *Cheshire.*   To award defendants judgment as prayed for in the counterclaim would amount to an adjudication that *Cheshire's* new invention

was not an infringement upon any of the patents now owned by the plaintiff. This question was not litigated. We feel that the record does not disclose facts justifying an adjudication upon that question. The denial of relief to the plaintiff is in effect a judicial confirmation to the defendants of its rights in *Cheshire's* new invention, so far as the issues litigated are concerned. While the defendant is not entitled to judgment as prayed for in its counterclaim, it should not be foreclosed by judgment of dismissal upon the merits. Full justice will be done if the counterclaim be dismissed without prejudice. The judgment must therefore be modified so that the defendants' counterclaim shall be dismissed without prejudice.

*By the Court.*—The judgment appealed from is affirmed as to the issues raised by the plaintiff's complaint. As to the defendants' counterclaim, the judgment of dismissal is modified as indicated in the opinion, and as so modified is affirmed.

The following opinion was filed July 12, 1920:

ESCHWEILER, J. (*dissenting*). I am in accord with so much of the majority opinion as upholds the trial court in its conclusion that the plaintiff is not estopped to assert such rights as plaintiff might have acquired under its contract of January, 1911. I am also in accord with so much as holds that such contract of January, 1911, was a valid and subsisting one and that the obligations of *Cheshire* were not put at an end by the termination of his employment with the plaintiff.

The contract of January, 1911, being but a modification of the preceding contract, needed no new and additional or other consideration than that which supported the original. *Foley v. Marsch,* 162 Wis. 25, 30, 154 N. W. 982; *Schoblasky v. Rayworth,* 139 Wis. 115, 117, 120 N. W. 822; *Montgomery v. American C. Ins. Co.* 108 Wis. 146, 159, 84

N. W. 175; *Brown v. Everhard,* 52 Wis. 205, 207, 8 N. W. 725.

I am in further accord with the holding that there would be nothing inequitable, unconscionable, or contrary to public policy in the enforcement of plaintiff's contract as against the defendants if it can properly be held to cover and include what is claimed by plaintiff.

I do, however, dissent from the conclusion arrived at by the majority in this case that the paper-handling and feeding device as proposed to be used by defendants in connection with the new form of cylinder press is not within plaintiff's contract.

The paper-handling and feeding device upon which the letters patent were first issued and duly assigned to plaintiff was for a novel idea, not for the mere embodiment thereof in the particular device which plaintiff attached to the platen press. This idea, the product of *Cheshire's* inventive genius, became secured to the plaintiff by what all the members of this court hold was a lawful, valid, and binding contract and one that upon the grounds of public policy could not be denied enforcement. This invention became of commercial and substantial value by the speculative expenditure of large sums of plaintiff's money. The patent obtained from the government and assigned to plaintiff did give the plaintiff that which is recognized as a legal and defensible monopoly in the same during the life of the patent. *U. S. v. U. S. M. Co.* 247 U. S. 32, 57, 38 Sup. Ct. 581. By the combination of a "paper-handling and feeding mechanism," so described by *Cheshire* himself in his new applications, with the so-called new form of cylinder press, the defendants are now being permitted, so far as a judgment of a state court can go as to such subject matter, to proceed with what will evidently be a serious and substantial impairment in the commercial value of that which was originally obtained by plaintiff.

That plaintiff may have no desire to use or be unable to use the precise form in which this "paper-handling and

feeding" mechanism idea is found in the physical embodiment thereof as proposed for the new form of cylinder press, is entirely immaterial.  Having secured a right to this as an invention and patent, plaintiff has the right, even though not using it, to exclude competitors from using it. *Henry v. A. B. Dick Co.* 224 U. S. 1, 29, 32 Sup. Ct. 364; *U. S. v. Winslow,* 227 U. S. 202, 217, 33 Sup. Ct. 253.

The original device for which plaintiff paid *Cheshire* a substantial sum was of no commercial value then to plaintiff except as it might be used in connection with the Gordon or platen press.  The latter plaintiff must secure upon such terms as it could from some third person manufacturing or controlling the manufacture of the same.  The idea embodied in the original paper-handling and feeding device was necessarily considered as a unit of itself, and for the purposes of letters patent it must necessarily be so; for patents are granted for ideas as units, not as fractions, nor for mere combinations of separate patented or patentable units.  As such original unit it acquired commercial value from being attached to the platen press.  There was no new unit created by the application of this paper-handling and feeding device to the platen press so as to make such a new idea or combination so that as such it became the subject of letters patent.  It was the same unit before being attached to the platen press that it was after being so attached, and *vice versa.*

In what defendants now propose to use, the individuality of the idea of a paper-handling and feeding device is as clear and distinct in the specifications prepared by *Cheshire* himself and in the application of the idea to the new form of cylinder press as it is under the original applications and subsequent use.  The details of the form of its becoming embodied in a device are different, but the idea, the subject of invention and of letters patent, is as much present in the one as in the other, and can be seen with as little difficulty in the latter device as in the former.

If some person other than *Cheshire* had originated the idea embodied in the change of position of the cylinder in the so-called *Cheshire* cylinder press to which defendants assert rights and then *Cheshire* had been induced to apply to such new idea of a press the paper-handling and feeding mechanism as embodied in his subsequent applications here involved, it would seem plain that his so applying such a "paper-handling and feeding mechanism" to such third person's new idea of cylinder press would be a violation of the spirit and the letter of plaintiff's contract. That *Cheshire's* inventive genius was broad enough to cover the two fields— the new form of cylinder printing press as well as that of a paper-handling and feeding device—in no manner destroys the rights acquired by plaintiff as to the one field of that inventive genius that was originally developed by *Cheshire* at plaintiff's suggestion and on its money. ·

The idea of a paper-handling and feeding device as a unit was not swallowed up by its application to the platen press so as to lose its identity. I fail to see by what alchemy it can be held to have mysteriously disappeared, become absorbed, and swallowed up by its mere application to another form of press which accidentally happened to be also the result of *Cheshire's* inventive genius.

The Gordon press with the original paper-handling and feeding mechanism attached thereto becomes of more commercial value than the Gordon press as a hand feeder. It is quite possible that the new form of cylinder press now suggested by *Cheshire* will be of no substantial value except and unless a "paper-handling and feeding device" can be attached thereto. This demonstrates nothing more than the substantial value and worth of that which plaintiff purchased from *Cheshire* in the original instance. It no more makes the combination of such device with the new cylinder press a separate and distinct unit than did the added value to its combination with the Gordon press make that combination something more and independent.

To my mind the situation demonstrates that the parties intended by the contract of January, 1911, that *Cheshire's* inventive genius, so far as it related to a "paper-handling and feeding device," was to be at plaintiff's service for the term of seventeen years, and it paid substantial and valuable consideration for such an agreement. The defendants are now permitted to take advantage of the identical thing so pledged in good faith to plaintiff. I think, therefore, the plaintiff was entitled to the relief for which it prayed.

VINJE, J. I concur in the foregoing dissenting opinion of Mr. Justice ESCHWEILER.

A motion for a rehearing was denied, with $25 costs, on September 25, 1920.